# SEALED

CLERK'S OFFICE U.S. DIST. COURT
AT HARRISONBURG, VA
FILED

APR 1 9 2017

JULIA C. DUDLEY, CLERK
BY: /s/ K. Otto
DEPUTY CLERK

## UNITED STATES DISTRICT COURT

for the

Western District of Virginia

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>Facebook Account associated with Facebook user<br>identification number "100009640991715" maintained by<br>Facebook 1601 Willow Rd, Menlo Park, CA 94025 | )<br>)<br>)<br>)<br>)<br>)<br>)    Case No. 5:17mj12 |

### APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A (incorporated herein by reference)

located in the _____Western_____ District of _____Virginia_____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B (incorporated herein by reference)

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 18 U.S.C. § 1591 | Certain activities relating to material involving sex trafficking of children |
| Title 18 U.S.C. § 2423 | Certain activities relating to material involving transportation of minors |

The application is based on these facts:

See attached

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Received by reliable electronic
means and sworn and attested to
by phone.

~~Sworn to before me and signed in my presence.~~

Date: _____4/19/17_____

City and state: ~~Harrisonburg, VA~~    Charlottesville, VA

/s/ Tami J. Ketcham
*Applicant's signature*

Tami J. Ketcham, HSI Special Agent
*Printed name and title*

/s/ Joel C. Hoppe
*Judge's signature*

Honorable Joel C. Hoppe, United States Magistrate Judge
*Printed name and title*



IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF: | **SEALED** |
| INFORMATION ASSOCIATED WITH FACEBOOK USER IDENTIFICATION NUMBER "100009640991715" THAT IS STORED AT PREMISES CONTROLLED BY FACEBOOK INC. | Case No. 5:17mj12 |

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Tami Ketcham, a Special Agent with Homeland Security Investigations, being first

duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant for

information associated with a certain Facebook account bearing a specific user identification

number that is stored at premises owned, maintained, controlled, or operated by Facebook Inc.

("Facebook"), a social networking company headquartered in Menlo Park, California. The

information to be searched is described in the following paragraphs and in Attachment A. This

affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a),

2703(b)(1)(A) and 2703(c)(1)(A) to require Facebook to disclose to the government records and

other information in its possession, pertaining to the subscriber or customer associated with the

Facebook user identification number 100009640991715, which has displayed the profile/screen

name "Aldair Fuentes" (SUBJECT ACCOUNT).

2.      I am a Special Agent with the Homeland Security Investigations (HSI), and have

been since August 2010. As part of my duties as an HSI Special Agent, I investigate human

trafficking related crimes to include: 18 U.S.C. §1591, sex trafficking of children, and 18 U.S.C. § 2423, transportation of minors in interstate commerce for prostitution. I have participated in investigations involving violations of various federal laws including but not limited to: wire and mail fraud, forced labor, and sex trafficking by force, fraud, or coercion. I have participated in the execution of multiple subpoenas and federal search warrants. I have received training in investigations and prosecutions of human trafficking and have conducted human trafficking investigations.

3.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other law enforcement officers and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.     Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. §§ 1591 and 2423 have been committed by Junior Aldair FUENTES ORTIZ ("J FUENTES") as well as other co-conspirators working with J FUENTES. There is probable cause to search the information described in Attachment A for evidence of these crimes, as described in Attachment B.

## RELEVANT STATUTES

5.     This investigation concerns alleged violations of 18 U.S.C. § 1591 relating to sex trafficking of a child.

    a.  Title 18 U.S.C. § 1591 in part prohibits a person from knowingly recruiting, enticing, harboring, transporting, providing, obtaining, advertising, maintaining, patronizing or soliciting by any means another person if that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act.

    b.  Punishment for this offense under 18 U.S.C. § 1591(b) ranges from 10 years to life in prison.

2

6.     This investigation concerns alleged violations of 18 U.S.C. § 2423 relating to the transportation of minors in interstate commerce to engage in prostitution.

  a. Title 18 U.S.C. § 2423 in part prohibits a person from conspiring and knowingly transporting an individual under the age of 18 in interstate commerce with intent that the individual engage in prostitution, or in any sexual activity for which any person can be charged with a criminal offense.

  b. Punishment for this offense under 18 U.S.C. § 2423 ranges from 10 years to life in prison.

## BACKGROUND OF INVESTIGATION

7.     I have been conducting an investigation concerning J FUENTES, Santos Hipolito FUNETES VILLATORO ("S FUENTES"), and Sinia VENTURA RUBIO ("VENTURA") and their involvement in human trafficking in violation of 18 U.S.C. § 1591 and transportation of minors in interstate commerce for prostitution in violation of 18 U.S.C. § 2423. J FUENTES formed a relationship with JUVENILE VICTIM 1 ("JV1"), who was under 15 years old at the time, and transported her to Maryland where she was forced by S FUENTES to engage in a commercial sex act in or near August 2015. During that time, J FUENTES picked up JV1 from her home in Virginia and transported her against her will to Maryland. S FUENTES took JV1 to an unknown location where an unknown adult male told JV1 he paid for her and forced her to have sex with him.

8.     Prior to July 2015, JV1 had an account on Facebook containing the profile/screen name "Guanakiitha Martinez". J FUENTES, using a Facebook account bearing the profile/screen name "Aldair Fuentes," sent JV1 a friend request to her Facebook account, which JV1 accepted. JV1 had never seen or met J FUENTES in person.

9.    Through the specified Facebook accounts, the two exchanged messages and spoke with one another over a period of time.  J FUENTES told JV1 she was pretty, he liked her, he wanted to meet her, he wanted to be her boyfriend, he wanted her to leave Virginia to live with him in Maryland, and he would provide her with money and everything she needed.  As a result, JV1 felt that she "fell in love" with J FUENTES and J FUENTES was able to convince JV1 to run away from her home in Virginia.

10.    In July 2015, J FUENTES arrived at JV1's home in Virginia and transported her to Maryland, where he and his co-conspirators harbored her.  Upon arrival in Maryland, J FUENTES took possession of JV1's phone and J FUENTES told JV1 not to access her Facebook account bearing the screen/profile name "Guanakiitha Martinez" after she had accessed it twice while in Maryland.

11.    J FUENTES hid JV1 and would not allow her to communicate with anyone because law enforcement was looking for her as a runaway.

12.    Within approximately one week of arrival to Maryland, J FUENTES moved JV1 into a home where he and his father, S FUENTES, resided, in or near Hyattsville, Maryland. JV1 could not identify the address of the residence but identified a female whom she believed was the owner of the home.  JV1 identified the female through a photograph identification process that I conducted.  Through record checks, I identified the female as VENTURA.  JV1 confirmed that VENTURA lived in the residence with her husband and children at the time JV1 stayed there.

13.    In or near July 2015, JV1 heard people talking and making noises in the basement of the house where she was residing with J FUENTES, S FUENTES, and VENTURA.  JV1 asked J FUENTES who the occupants were, and she was told they were friends who were

4

renters. J FUENTES and VENTURA told JV1 she could not go down to the basement and JV1 observed the door inside the home leading to the basement was usually kept locked.

14. In or near July 2015, JV1 went into the basement on an occasion when the door was left unlocked. She identified approximately five females present in the basement, some of which she believed were possible minors. The females did not appear free to leave as there was no egress door that could be accessed from the basement to outside and the door leading to the main portion of the home remained locked. JV1 saw VENTURA transport the females at night to unknown locations.

15. JV1 suspected the females in the basement were being prostituted by VENTURA, J FUENTES and S FUENTES. JV1 contacted her mother to pick her up from Maryland. JV1 was able to make a call to her mother via Facebook using J FUENTES's phone and a Facebook account J FUENTES created that was associated with the screen/profile name "Guanakiitoo Fuentess". JV1 wanted to provide her mother with an address to pick her up but J FUENTES would not provide JV1 with the address of where they were residing. JV1's mother and uncle agreed to pick up JV1, who was escorted by J FUENTES, at a school located in or near Hyattsville, Maryland. JV1 was picked up by her mother and uncle and transported back home.

16. Within a short time of JV1 returning home, she found a cellular phone that J FUENTES placed in her clothing that he packed prior to JV1 leaving Maryland. The phone had the Facebook application installed on it, which enabled JV1 to access a Facebook account bearing the screen/profile name "Guanakiitoo Fuentess". J FUENTES contacted JV1 multiple times on that phone by using his Facebook account bearing the screen/profile name "Aldair Fuentes" to send messages and make phone calls to the Facebook account bearing the screen/profile name "Guanakiitoo Fuentess". Via the Facebook accounts, J FUENTES told JV1

5

he wanted her to return to Maryland with him and he wanted her to be his girlfriend again. JV1 informed J FUENTES she did not want to leave her home. J FUENTES also sent videos and messages to JV1, via Facebook, showing him cutting his arms and telling her it was her fault. J FUENTES threatened to kill himself if JV1 did not return to Maryland to be with him.

17.     In or near August 2015, J FUENTES showed up unannounced at JV1's home in Virginia. He called her and told her he was there to take her back to Maryland. JV1 stated she did not want to leave and J FUENTES told her to come outside to talk. JV1 initially refused to go outside but went outside after he threatened to come inside. While outside J FUENTES told JV1 to get in the car so they could talk. JV1 got in the car and J FUENTES closed the door and transported JV1 back to VENTURA's house in Maryland.

18.     After arrival in Maryland, J FUENTES took the phone back from JV1 that he had placed in her clothing prior to her leaving Maryland and returning home. J FUENTES also deactivated JV1's Facebook account bearing the screen/profile name "Guanakiitha Martinez". J FUENTES deactivated the account because he realized the police previously tracked him and JV1 by monitoring the Facebook account when JV1 initially ran away and went to live with J FUENTES in Maryland in or near July 2015.

19.     In or near August 2015, JV1 was able to gain access to the basement in VENTURA's residence a second time, during which time she noticed fewer females were present. JV1 believed these females were possibly minors, appeared to be of Hispanic descent, and they were crying. When JV1 asked where the other females were, she was informed they were taken to another location.   JV1 believes J FUENTES was responsible for picking the females up and taking them to the basement in Maryland. JV1 believes J FUENTES

communicated with these females through Facebook and that he maintained three Facebook accounts.

20.     At unknown times in or near July or August 2015, while at VENTURA's residence, unknown men approached JV1 inside the home by knocking on the door of JV1's room. The men were looking for J FUENTES and they entered JV1's room and closed the door to the room, offering money to JV1. JV1 indicated to law enforcement the men offered her money to have sex with her. JV1 informed law enforcement she left the room on those occasions without taking money from the men and without having sex with them.

21.     At an unknown time in or near July or August 2015, one of the females from the basement cried and told JV1 she had been taken to a room to have sex with a man. The female refused to tell JV1 any additional information as she was in fear of being physically assaulted.

22.     In or near August 2015, S FUENTES told JV1 he needed to take some clothing to J FUENTES. S FUENTES told JV1 to ride with him. The two arrived at an unknown location where JV1 was encountered by an adult male. The male told JV1 he had already paid S FUENTES for her and she would have to go to S FUENTES to obtain the money. The adult male forced JV1 to have sex with him while S FUENTES waited outside of the room. JV1 told J FUENTES of this sex act and he responded only by laughing when JV1 related the story to him.

23.     In or near August 2015, S FUENTES arranged and paid for JV1 and J FUENTES to be transported to Texas. JV1 expressed she did not want to go to Texas, but she was not given a choice. While driving through Virginia, JV1 asked J FUENTES to let her go home, but he refused. The two arrived in Texas and resided with J FUENTES' aunt, whose identity is not known at this time.

24.     Between August 2015 and December 2015, while in Texas, J FUENTES forced JV1 to have sex with him on at least two occasions. J FUENTES hit and pushed JV1, pulled her hair, and locked her in the bathroom. J FUENTES forced JV1 to use drugs through threats and physical acts of violence and JV1 believes J FUENTES drugged her while she was sleeping. J FUENTES also assisted JV1 with obtaining employment at a local market in Texas, and, when she was paid, he took her salary from her, stating he could take the money because she worked for him. JV1 was eventually able to escape the situation and return back home to Virginia in or near December 2015.

25.     Approximately two months after returning back home, JV1 created a new Facebook Account bearing the screen/profile name "Guanakiitha Lopez". At an unknown time, suspected to be after July 2016, at least two messages were sent from a Facebook account bearing the screen/profile name "Aldair Fuentes" to the Facebook account belonging to JVI bearing the screen/profile name "Guanakiitha Lopez". JV1 believes she deleted the messages and blocked the Facebook account bearing the screen/profile name "Aldair Fuentes" to prevent any future messages from being sent from that account to her account.

26.     On various occasions in 2015 and 2016, a Facebook account associated with screen/profile name "Aldair Fuentes" had contact through Facebook with other minor females in Virginia who were associated with JV1.

27.     At an unknown time, in or near July or August 2015, J FUENTES changed the profile/screen name of his Facebook account from "Aldair Fuentes" to "Aldair Y Yamileth Enamorados". J FUENTES posted a photograph of JV1 on the Facebook page of that account; that photograph was taken of JV1 in front of the Maryland home where she resided with J FUENTES, S FUENTES and VENTURA.

8

28.     In June 2016, at the request of law enforcement, JV1 identified a Facebook profile page containing the profile/screen name "Aldair Fuentes". The Facebook user identification number assigned to the page was identified as 100009640991715. The user identification number was identified by reviewing the profile page's Uniform Resource Locator (URL), https://www.facebook.com/100009640991715.

29.     In July 2016, I submitted an Immigration Enforcement Subpoena to Facebook requesting subscriber information for the Facebook account associated with user identification number 100009640991715. I received subpoena return information from Facebook, which revealed the Facebook account was created on June 5, 2015, the name registered to the Facebook account was Aldair Fuentes and email addresses registered to the account were jnrfnts@gmail.com and ortizvntr@gmail.com.

30.     In October 2016, I identified a Facebook account, bearing screen/profile name "Aldair Fuentes" and containing photographs of J FUENTES, was listed as a friend on JV1's Facebook page bearing screen/profile name "Guanakiitha Lopez".

31.     On October 18, 2016, I submitted a preservation request to Facebook (Facebook case number 908769) requesting the Facebook account associated with user identification number 100009640991715 be preserved. A preservation request extension for the same account was submitted and the request will remain in effect until April 18, 2017.

32.     In November, Prince George's County Police Department (PGCPD) encountered and identified J FUENTES as a potential witness of a homicide that took place in Hyattsville, Maryland. During an interview with PGCPD, J FUENTES provided a statement regarding his knowledge of the homicide and J FUENTES reported he was a member of the Mara Salvatrucha (MS) 13 gang, Sailors clique. I am aware the MS-13 gang is known to organize and facilitate

9

prostitution through the trafficking of juvenile females. MS-13 has been known to identify, through social media such as Facebook, juveniles who are vulnerable, impressionable, and who may be recent entrants into the United States from Latin American countries. MS-13 members have initiated online relationships with such juveniles, eventually luring them away from their homes and forcing them to participate in commercial sex acts.

## NATURE OF RECORDS TO BE SEARCHED

33.     From my review of publicly available information provided by Facebook about its service, including Facebook's "Privacy Policy," I am aware of the following about Facebook and about the information collected and retained by Facebook.

34.     Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com. Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

35.     Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter. This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. A user ID, also known as a Facebook ID, or a username is assigned to each Facebook account.

36.     Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual

Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

37.     Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

38.     Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to other Facebook users who have permission to view the user's profile.

39.     Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when the user uploaded the photo or video. It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

40.     Facebook users can exchange private messages on Facebook with other users. These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well as other information. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a chat feature that allows users to send and receive instant messages through Facebook. These chat communications are stored in the chat history for the account. Facebook also has a video calling feature, and although Facebook does not record the calls themselves, it does keep records of the date and time of each call, the caller recipients and the author of the call.

41.     If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

42.     Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

43.     Facebook has a search function that enables its users to search Facebook for keywords, usernames, profile names, or pages, among other things.

44.     Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

45.     Facebook has a Marketplace feature, which allows users to post classified ads. Users can post items for sale.

46.     In addition to the applications described above, Facebook also provides its users with access to a multitude of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

47.     Facebook uses the term "Neoprint" to describe an expanded view of a given user profile. The "Neoprint" for a given user can include the following information from the user's profile: profile contact information; mini-feed information; status updates; shares; notes; wall postings; friends listings with friends' Facebook IDs; group listings with Facebook group IDs; futures and past events; and video listing with file names.

48.     Facebook retains Internet Protocol ("IP") logs for a given user ID, username, or IP address. These logs may contain information about the actions taken by the user ID, username, or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID, username and IP address associated with the action. For

example, if a user logs into the Facebook profile, that user's IP log would reflect the fact that the user logged in and would show when and from what IP address the user did so.

49.     Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

50.     As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's "Neoprint," IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which

14

users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Facebook builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner. Lastly, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

51.     Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

52.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B.

Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

53.     Based on the forgoing, I request that the Court issue the proposed search warrant.

54.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is a court of the United States that "has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

55.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

Respectfully submitted,

Received by reliable electronic means
and sworn and attested to by phone
on April 19, 2017.

/s/Tami J. Ketcham
Tami J. Ketcham
Special Agent
Homeland Security Investigations

~~Subscribed and sworn to before me on~~ XXXXXXXXXXXXXXXXXXXXXXXX, 201XX

UNITED STATES MAGISTRATE JUDGE

16

**ATTACHMENT A**

**Property to Be Searched**

This warrant applies to information associated with the Facebook account bearing user identification number 100009640991715 that is stored at premises owned, maintained, controlled, or operated by Facebook Inc., a company headquartered in Menlo Park, California.

## ATTACHMENT B

### Particular Things to be Seized

I.   **Information to be disclosed by Facebook**

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook Inc. ("Facebook"), including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, to include all information preserved under Facebook case number 908769 pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government for the user identification number listed in Attachment A:

(a)   All user basic subscriber information, which consists of contact and personal identifying information including full name, user identification number, birth date, gender, e-mail addresses, Facebook passwords, Facebook security questions and answers, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers;

(b)   All activity logs for the account and all other documents showing the user's posts and other Facebook activities;

(c)   All User Photo Print including photos and videos uploaded by that user and all photos and videos uploaded by any user that have that user tagged in them, Exchangeable Image File (EXIF) for all photos and videos associated with the user;

(d)   All "Neoprint" profile information including News Feed information, mini-feed, status updates, notes, links to videos, links to photographs, links to articles, links to other items, notes, wall postings, friend lists with friends' Facebook user

identification numbers, groups and networks of which the user is a member with the groups' Facebook group identification numbers, future and past event postings, rejected "Friend" requests, comments, pokes, tags, information about the user's access and use of Facebook applications;

(e) All other records of communications and messages made or received by the user, including all private messages, Facebook Messenger content, chat history, video calling history, and pending "Friend" requests;

(f) All "check ins" and other location information;

(g) All IP logs, including all records of the IP addresses that logged into and out of the account;

(h) All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

(i) All information about the Facebook pages that the account is or was a "fan" of;

(j) All past and present lists of friends created by the account;

(k) All records of Facebook searches performed by the account;

(l) All information about the user's access and use of Facebook Marketplace;

(m) The types of service utilized by the user;

(n) The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

(o) All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

2

(p)     All records pertaining to communications between Facebook and any person

        regarding the user or the user's Facebook account, including contacts with support

        services and records of actions taken.

## II.     Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence and

instrumentalities of violations of 18 U.S.C. §§ 1591 and 2423 involving Junior Aldair FUENTES

and his coconspirators since June 5, 2015, including, for the user identification number identified

on Attachment A, information pertaining to the following matters:

(a)     Communications to and from JV1 and images of JV1, which establish a

        relationship with J FUENTES;

(b)     Communications to and from JV1, which establish knowingly recruiting, enticing,

        harboring, transporting, providing, obtaining, advertising, maintaining,

        patronizing or soliciting by any means JV1 who has not attained the age of 18

        years and was caused to engage in a commercial sex act;

(c)     Communications to and from JV1, which establish conspiring and/or knowingly

        transporting JV1 who is under the age of 18 in interstate commerce with intent

        that JV1 engage in prostitution, or in any sexual activity for which any person can

        be charged with a criminal offense;

(d)     Communications to and from friends of JV1 on Facebook, which establish J

        FUENTES' attempts to initiate relationships with those friends, to correspond

        with those friends about JV1, to approach those friends about traveling with him,

        and/or to recruit or entice those friends to engage in commercial sex act;

(e)     Communications to and from J FUENTES to other females that involve any attempt or effort to recruit, entice, harbor, transport, provide, obtain, advertise, maintain, patronize or solicit those individuals for the purpose of having that individual engage in a commercial sex act;

(f)     Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner;

(g)     Evidence indicating the Facebook account owner's state of mind as it relates to the crime under investigation;

(h)     The identity of the person(s) who created or used the username, including records that help reveal the locations where the user visited;

(i)     The identity of the person(s) who communicated with the user of the Facebook account about matters relating to human trafficking and transportation for the purpose of prostitution, including records that help reveal their whereabouts.